Filed 3/24/25  Gayfield v. Interinsurance Exchange etc. CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| BRUCE GAYFIELD et al.,<br><br>Plaintiffs and Appellants,<br><br>v.<br><br>INTERINSURANCE EXCHANGE OF THE AUTOMOBILE CLUB OF SOUTHERN CALIFORNIA et al.,<br><br>Defendants and Respondents. | B331776<br><br>(Los Angeles County Super. Ct. No. 22STCV09172) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Gail Killefer, Judge.  Affirmed.

Gary Rand & Suzanne E. Rand-Lewis, Suzanne E. Rand-Lewis and Timothy D. Rand-Lewis for Plaintiffs and Appellants.

Lewis Brisbois Bisgaard & Smith, Raul L. Martinez and Celia Moutes-Lee for Defendants and Respondents.

———————————————

Plaintiffs and appellants Bruce Gayfield, Orpha Gayfield, and Vicki Wilson are the former tenants of an apartment in Long Beach. They filed suit against the owners of the apartment asserting claims related to uninhabitable conditions. Based on their renter's insurance policy, appellants also sued Interinsurance Exchange of the Automobile Club of Southern California (the Exchange) and ACSC Management Services, Inc. (ACSC) (collectively, respondents), asserting respondents unlawfully denied their claims for mold remediation and property losses arising from water damage at the apartment.

Appellants challenge a judgment of dismissal entered after the trial court sustained demurrers to their original, first amended, and second amended complaints. The trial court concluded appellants had not alleged that ACSC, the attorney-in-fact for the Exchange, was a party to the contract or an alter ego of the Exchange. The court thus dismissed all claims against ACSC without leave to amend. After permitting the appellants to twice amend their complaint against the Exchange, the trial court sustained the Exchange's demurrer to the second amended complaint without leave to amend. We affirm the judgment of dismissal.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

In October 2019, appellants leased an apartment in Long Beach from 3101 E. Artesia Apartments, LLC, and Amusement Industry Inc., doing business as Westland Real Estate Group (collectively the owners). The Exchange issued appellants a "Members' Renters Policy" (the Policy), effective April 26, 2020, through April 26, 2021. The Exchange is a reciprocal insurer, and ACSC is its attorney-in-fact.[2]

The Policy provides coverage, in relevant part, for:

---

[1] We draw our facts from the allegations in the operative first and second amended complaints and attached exhibit. (*Rufini v. CitiMortgage, Inc.* (2014) 227 Cal.App.4th 299, 302; *Hill v. Roll Internat. Corp.* (2011) 195 Cal.App.4th 1295, 1300.) Consistent with the standard of review, we assume the truth of the properly pleaded factual allegations and do not assume the truth of contentions, deductions, or conclusions of law. (*People ex rel. Allstate Ins. Co. v. Discovery Radiology Physicians, P.C.* (2023) 94 Cal.App.5th 521, 532 (*Discovery Radiology Physicians*).)

[2] "A reciprocal insurance exchange (also called an interinsurance exchange) ' "is an unincorporated business organization of a special character in which the participants, called subscribers . . . are both insurers and insureds; for their mutual protection, they exchange insurance contracts through the medium of an attorney-in-fact." ' [Citations.] By statute, the reciprocal insurance exchange is deemed the insurer and each subscriber is deemed an insured. ([Ins. Code,] § 1303.)" (*Fogel v. Farmers Group, Inc.* (2008) 160 Cal.App.4th 1403, 1406–1407; see also Croskey, et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2024) ¶ 1:100.) An "interinsurance exchange is managed by the attorney-in-fact, which may be a corporation, and which is appointed by the subscribers through powers of attorney." (*Fogel*, at p. 1407.)

"OTHER COVERAGES – Part I

[¶] . . . [¶]

13.    MOLD, FUNGUS, WET ROT, DRY ROT, OR BACTERIA

We will pay for:

a.  The reasonable and necessary ***remediation*** of mold, fungus, wet rot, dry rot, or bacteria . . . if the mold, fungus, wet rot, dry rot, or bacteria is caused by or results from a loss covered under Part I."

Part I sets forth "WHAT LOSSES ARE COVERED – COVERAGE C":

"Except as excluded under WHAT LOSSES ARE NOT COVERED – PART I, we cover the following losses to personal property . . . .

[¶] . . . [¶]

2.    accidental direct physical loss from:

a.  WINDSTORM OR HAIL.

We do not cover loss from sand, dust, rain, snow or sleet or property contained in a building unless the direct force of wind or hail damages the building, causing an opening in a roof or wall, and the sand, dust, rain, snow or sleet enters through this opening.

[¶] . . . [¶]

k.  SUDDEN AND ACCIDENTAL DISCHARGE OR OVERFLOW OF WATER OR STEAM from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system or from within a household appliance. . . ."

Finally, a section titled "WHAT LOSSES ARE NOT COVERED – PART 1" provides in relevant part:

"2. We do not cover any loss to [the] property insured under PART I that is caused by, resulting from, contributed to or consisting of: [¶] . . . [¶]

    c. WATER DAMAGE, meaning:
        [¶] . . . [¶]
        (4) damage to the interior of a building from rain, snow or sleet unless the walls or roof of the building have first sustained a loss from a cause of loss covered under PART I that created an opening through which the rain, snow or sleet entered; . . . ."

In March 2022, appellants filed suit against the owners and respondents, alleging several claims for breach of contract and negligence, as well as breach of the warranty of habitability and fraud and consumer protection claims.

Appellants alleged that at the outset of the lease, the owners failed to disclose that the apartment was in significant disrepair. The complaint alleged "the premises had been exposed to toxic chemicals due to an endemic roach infestation, the structures were defective, the premises had ongoing water intrusion, mold and mildew, from both wind driven rain, wind damage and sudden and accidental discharges of water, Defendants fumigated because of ongoing insect infestation including roaches, which infestation was severe and permanent, the buildings systems were old, poorly maintained, the staircase was unsafe, lighting was insufficient, the other tenants and their visitors were unsafe and interfered with tenants [*sic*] quiet

5

enjoyment, the premises was a slum which was not 'resort like', was not weather or water tight, the windows did not close or lock, there was inadequate storage for trash which was improperly stored, and remained unsecured, was not promptly removed, there was persistent theft and crime was not properly managed, maintained or fumigated, was not safe or secure, that Defendants did not have adequate trained personnel to manage and maintain the property, that if Plaintiffs complained they would be retaliated against."

The complaint summarized: "the premises was defective, uninhabitable, unhealthy and unsafe, as there was a complete lack of upkeep and maintenance including mold, mildew, fungus, roaches, mites, insects, trespass, inadequate sanitation/trash storage, inadequate lighting, crime, noise, odor, trash, no services, interference with parking, weather intrusion, water intrusion, lack of security, windows did not close or lock, and the conditions caused the premises to be uninhabitable . . . ."

According to the complaint, in March 2020, appellants complained to the owners "about water intrusion, which had resulted in what appeared to be visible mold, roaches, that the premises was not weather tight, the existence of the window which needed repair, mold and mildew in the premises and which had affected their personal property . . . ." This was "in part as a result of catastrophic March 2020, rain and wind storms which caused wind driven rain and water intrusion into the premises . . . ."

From July 2020 to May 2021, the "premises remained unrepaired" and appellants continued to complain about mold and mildew, among other issues.

The complaint alleged that wind and rainstorms occurred again in early 2021, including in March 2021. Appellants noticed "an increase in the persistent mold [and] mildew," which appellants were informed and believed was the result of "ongoing water intrusion, from both wind driven rain, wind damage and sudden and accidental discharges of water."

In May 2021, after receiving no response from the owners, appellants reported the conditions of the apartment to respondents, their insurance company. Their claimed losses included "water damaged property and premises resulting in mold . . . ." According to the complaint, respondents did not "inform [appellants] of available benefits or offer them," or do any "field investigation" of the insurance claim. In July 2021, respondents denied the claim, stating they needed "undisclosed" information from the owners, which they had been unable to obtain. The complaint alleged respondents did not conduct a reasonable investigation of the loss, "which it knew occurred concurrently with historic catastrophic wind and rainstorms in the area, with the likelihood of other covered water intrusion which were covered losses which it was required to reasonably adjust and cover . . . ."

The complaint asserted five claims against respondents: (1) breach of express and implied contract; (2) breach of the covenant of good faith and fair dealing; (3) intentional infliction of emotional distress; (4) fraud, negligent misrepresentation, and concealment; and (5) violation of Business and Professions Code section 17200.

Respondents demurred to the complaint.[3] In November

_____

[3]     In early November 2022, the trial court severed the claims against respondents from the claims against the owners.

7

2022, the trial court sustained the demurrer to all claims against ACSC, without leave to amend, on the ground that the complaint included no allegations that would support a basis for liability. The court determined the complaint failed to allege that ACSC was either a party to the Policy or an alter ego of the Exchange.

As to the claims against the Exchange, the court sustained the demurrer with leave to amend. As to the breach of contract claim, the court noted the complaint failed to allege the legal effect of the parties' contract. The complaint did not allege "any of the relevant terms, policy conditions, and applicable coverages," and appellants had not attached a copy of the Policy to the complaint. The court thus ruled that the complaint failed to allege the elements of a breach of contract claim. The court similarly concluded the complaint failed to sufficiently plead the remaining causes of action against the Exchange.

In December 2022, appellants filed a first amended complaint (FAC) alleging the same five causes of action against the Exchange and attaching a copy of the Policy. The FAC again alleged that the owners failed to disclose that the "structures were defective, the premises had ongoing water intrusion, mold and mildew, from both wind driven rain, wind damage and sudden and accidental discharges of water . . . ." It also alleged once more that the apartment was a "slum" and in disrepair, including that it was "not weather or water tight, the windows did not close or lock."

As in the original complaint, the FAC alleged that in March 2020, appellants complained to the owners about water intrusion resulting in mold, that the premises were not weather tight, and about a window that needed repair. They again attributed this in part to "catastrophic March 2020, rain and wind storms which

8

caused wind driven rain and water intrusion into the premises . . . ." However, the complaint now also alleged that these were "covered losses under their insurance policy as stated below . . . ."

The FAC once again alleged that in early 2021, including March 2021, there were wind and rainstorms and appellants "noticed an increase in the persistent mold [and] mildew," which they alleged, on information and belief, was from "ongoing water intrusion, from both *covered* wind driven rain, wind damage and sudden and accidental discharges of water." (Italics added.)

The FAC alleged that appellants submitted an insurance claim based on a covered loss under the Policy from the "severe wind and rainstorms in early 2021, including March 2021, which caused covered damage including the need for mold testing and remediation due to persistent mold [and] mildew . . . from ongoing water intrusion, from both wind driven rain, wind damage and sudden and accidental discharges of water."

In February 2023, the Exchange again demurred to the complaint, arguing the allegations failed to state a claim. The Exchange argued the Policy only covered losses from "wind-driven rain when the direct force of wind or hail creates an opening in a roof or wall that allows the rain to enter." It contended the FAC's allegations established the "claimed damage was caused by long-term water intrusion occurring over the course of more than a year due to a poorly maintained building," and the FAC admitted that a " 'structural defect' " in the building caused the water intrusion. The Exchange argued appellants' "general conclusory allegations" that wind-driven rain and wind damage caused the claimed damage were "belied by the specific, factual allegations of the FAC" that the apartment was not weather or water tight since the windows did not close or lock,

9

that a window was in need of repair, that structural defects caused the claimed property damage, and that the water intrusion began in March 2020 and was ongoing.

The Exchange asserted the bad faith cause of action necessarily failed because the complaint did not state a cause of action for breach of contract. The Exchange further argued the complaint alleged no extreme and outrageous conduct necessary to support an intentional infliction of emotional distress claim; the complaint did not satisfy pleading standards for fraud; and the derivative Business and Professions Code section 17200 claim likewise failed.

The trial court sustained the demurrer, granting leave to amend only as to the breach of express and implied contract and breach of the covenant of good faith and fair dealing causes of action. The court agreed with the Exchange's argument that appellants' conclusory allegations regarding wind-driven rain and wind damage as the source of the loss contradicted the "specific factual scenario" alleged in the complaint. The court likewise agreed with the Exchange's arguments as to the remaining causes of action.

In April 2023, appellants filed a second amended complaint (SAC). In the SAC, appellants alleged for the first time that in March 2021, a rain and windstorm occurred that "caused openings in the roof and wall surfaces through which rain intruded into the premises, which were additional covered losses under the policy." They also alleged for the first time that in early 2021 there were "sudden and accidental discharges of water *from the plumbing*, all covered by the policy." (Italics added.) As in prior versions of the complaint, the SAC alleged that in March 2021, appellants noticed an "increase" in the "persistent mold

10

[and] mildew" which they believed was due to "wind driven rain" in early 2021.

The SAC, like the prior versions of the complaint, alleged that "at the time Plaintiffs leased and began to reside in the premises," "the structures were defective," the premises was a "slum which was not . . . weather or water tight," and it had "windows [that] did not close or lock." The SAC also continued to assert that the owners had concealed "structural defects causing water intrusion," but now also alleged the owners had additionally concealed "roof and wall openings which permitted wind driven rain to occur . . . ." The SAC alleged as before that the owners had failed to disclose "ongoing water intrusion, mold and mildew, from . . . wind driven rain, wind damage[,] and sudden and accidental discharges of water . . . ."

The SAC still alleged that in March 2020, appellants first complained to the owner about water intrusion resulting in mold, but the SAC included the details that at that time, appellants also complained that the apartment "was not weather tight due to water intrusion from [a] windstorm [in] *which direct force of wind had caused an opening in the roof and wall surfaces through which rain entered the PREMISES*, the existence of [a] window which needed repair, mold and mildew . . . ." (Italics added.)

In May 2023, the Exchange demurred to the SAC. The Exchange argued appellants had filed a sham pleading, asserting that after repeatedly alleging the water intrusion was the result of structural defects, appellants were suddenly alleging "in wholly conclusory fashion that the water intrusion was a result of the direct force of wind creating an opening in the walls and roof that allowed rain to enter . . . . In other words, in a desperate attempt to save their case, [appellants] have merely 'copy and

11

pasted' the policy language into their pleading, which is completely unsupported and contradicted by the actual facts alleged." In opposition to the demurrer, appellants asserted the SAC did not allege inconsistent facts, but "simply alleges the same facts in more detail as required by the Court's ruling. More specifically, [appellants' FAC] alleged that damage was caused by 'wind driven rain, wind damage and sudden and accidental discharges of water.' "

In June 2023, the trial court sustained the Exchange's demurrer without leave to amend. The court rejected appellants' argument that the SAC merely added details to the allegations that were consistent with the prior versions of the complaint. Instead, the court agreed that appellants' "conclusory allegations contradict the specific factual scenario as alleged in their pleadings, that the damage caused was one due to structural, longstanding defects." The court concluded the SAC failed to plead facts to show the losses were covered under the Policy and that the Exchange had a duty it breached. The cause of action for breach of the covenant of good faith and fair dealing thus also failed.

The trial court entered judgment in respondents' favor on July 3, 2023. Appellants filed a timely notice of appeal.

## DISCUSSION

Appellants argue that the trial court erred to the extent it sustained each demurrer without leave to amend. We find no error.[4]

---

[4]     Appellants contend the trial court erred in sustaining the first demurrer without leave to amend as to ACSC on the grounds that it was necessary for the complaint to allege ACSC is

12

## I.     Standard of Review

"  '  "On appeal from an order of dismissal after an order sustaining a demurrer, the standard of review is de novo: we exercise our independent judgment about whether the complaint states a cause of action as a matter of law.  [Citation.]  First, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context.  Next, we treat the demurrer as admitting all material facts properly pleaded.  Then we determine whether the complaint states facts sufficient to constitute a cause of action.  [Citation.]  [¶]  We do not, however, assume the truth of contentions, deductions, or conclusions of law.  [Citation.]" ' " (*Discovery Radiology Physicians*, *supra*, 94 Cal.App.5th at p. 532.)

"If a demurrer is sustained, we exercise our independent judgment on whether a cause of action has been stated as a matter of law, regardless of reasons stated by the trial court. [Citation.]  We affirm if the trial court's decision was correct on any theory." (*Tucker v. Pacific Bell Mobile Services* (2012) 208 Cal.App.4th 201, 210–211.)

## II.    The Trial Court Correctly Sustained the Demurrer to the Breach of Contract Cause of Action in the SAC

"A cause of action for damages for breach of contract is comprised of the following elements: (1) the contract, (2) plaintiff's performance or excuse for nonperformance,

---

an alter ego of the Exchange, and that the complaint failed to sufficiently allege that ACSC was a party to the Policy.  We need not and do not reach this issue because we determine that the first and second amended complaints otherwise failed to state a cause of action for reasons that would apply equally to ACSC if it remained a defendant in the action.

(3) defendant's breach, and (4) the resulting damages to plaintiff." (*Careau & Co. v. Security Pacific Business Credit, Inc.* (1990) 222 Cal.App.3d 1371, 1388.)  In this case, the demurrer asserted the SAC failed to allege facts sufficient to establish a breach of the insurance contract.

The Exchange asserts the Policy only covers losses caused by wind-driven rain when the direct force of wind creates an opening in a roof or wall that allows rain to enter.  Appellants do not dispute this reading of the Policy.  Instead, they contend the trial court erred in sustaining the demurrer because the SAC specifically alleged that appellants' May 2021 claim under the Policy sought coverage for losses caused by "a 'catastrophic . . . rain and windstorm with catastrophic wind . . . which caused openings in the roof and wall surfaces through which rain intruded. . . .' "  Appellants assert that although the SAC also alleged prior damage as a result of structural defects, including a defective window, the SAC did not allege that water intrusion occurred only through the window and appellants did not file a claim for damage occurring prior to March 2021.  Appellants thus argue "[t]he fact that Appellants alleged prior problems with the premises, including structural problems, does not obviate coverage when a specific wind driven loss occurs."  Appellants further contend the trial court erred by making an implicit factual finding that structural, longstanding defects caused their losses, rather than accepting as true the SAC's allegations about wind-caused openings in the roof and walls.

Appellants' contentions on appeal ignore that the trial court accepted the Exchange's argument that the SAC's allegations reciting the language of the Policy constituted a "sham pleading."  The court therefore disregarded those

14

allegations. Appellants' failure to argue error as to that aspect of the trial court's ruling arguably forfeits the claim. However, even if we do not deem the argument forfeited, we find no error.

" ' "Generally, after an amended pleading has been filed, courts will disregard the original pleading. [Citation.] [¶] However, an exception to this rule is found . . . where an amended complaint attempts to avoid defects set forth in a prior complaint by ignoring them. The court may examine the prior complaint to ascertain whether the amended complaint is merely a sham." [Citation.] . . . Moreover, any inconsistencies with prior pleadings must be explained; if the pleader fails to do so, the court may disregard the inconsistent allegations. [Citation.] Accordingly, a court is "not bound to accept as true allegations contrary to factual allegations in former pleading in the same case." [Citation.]' [Citations.]" (*Larson v. UHS of Rancho Springs, Inc.* (2014) 230 Cal.App.4th 336, 343.) Plaintiffs may avoid the application of the sham pleading doctrine by alleging an explanation for the conflicts between the pleadings. (*Id.* at p. 344.)

The trial court did not err in applying the sham pleading doctrine here. In the first iteration of the complaint, appellants alleged losses due to the slum-like conditions of their apartment, which included structural defects, a window that would not close, and a building that was not watertight. Although the complaint referenced wind and rainstorms in March 2021, it described the related losses as "an increase in the persistent mold [and] mildew," and alleged only on information and belief that the mold and mildew problems were the result of "ongoing water intrusion, from both wind driven rain, wind damage and sudden and accidental discharges of water." Despite providing other specific

15

allegations about the apartment's state of disrepair, the complaint did not allege a wind-caused opening in a roof or wall that allowed rain to enter the building, or a sudden discharge of water from the plumbing.

Respondents' demurrer to the original complaint argued appellants failed to allege a covered loss in part because the Policy only covered "wind-driven rain when the direct force of wind or hail creates an opening in a <u>roof or wall</u> that allows the rain to enter." (Emphasis in original.) Yet, in the FAC, appellants' allegations were largely unchanged, except to generically assert the losses were *covered* losses, and the damage was *covered* damage. Although the FAC attached a copy of the Policy, it included no factual allegations regarding wind causing an opening in the apartment's roof or walls, or any sudden discharge of water from the apartment's plumbing.

Only after the Exchange demurred to the FAC, prominently arguing that appellants failed to state a cause of action due to the limited nature of the policy, did appellants add allegations to the SAC that, at the time the lease began, the owner concealed that there was a wind-caused opening "in the roof and wall surfaces through which rain entered," and that, subsequently, in early 2021, a catastrophic rain and windstorm caused openings in the roof and walls, through which rain entered the apartment, and that there were also sudden discharges of water from the plumbing.

In their opening brief on appeal, appellants do not specifically acknowledge the sham pleading issue and only contend that the new allegations were not inconsistent with the prior versions of the complaint because appellants had not previously alleged that the water intrusion was *only* the result of

16

structural defects in the building. In their reply brief, appellants asserted, as they did in the trial court, that these new allegations were not a "sham," but instead simply added detail to their prior allegations.

We acknowledge that the sham pleading doctrine " ' "is not intended to prevent honest complainants from correcting erroneous allegations or to prevent the correction of ambiguous facts." [Citation.] Instead[,] "the rule must be taken together with its purpose, which is to prevent [an] amended pleading which is only a sham, when it is apparent that no cause of action can be stated truthfully." [Citations.]' " (*Dones v. Life Ins. Co. of North America* (2020) 55 Cal.App.5th 665, 688 (*Dones*).)

In this case, the trial court properly found notable the lack of factual detail in appellants' new allegations that would bring the alleged losses within the scope of the Policy's coverage. The initial complaint provided numerous details regarding the uninhabitable state of the building. It identified specific concerns, such as particular pests and safety issues like insufficient lighting. Regarding mold, the complaint only alleged the 2021 wind and rainstorms increased the persistent mold problems, "which Plaintiffs are informed and believe were from ongoing water intrusion, from both wind driven rain, wind damage and sudden and accidental discharges of water." The *specific* allegations in the original complaint concerning mold related the problem to structural defects and a defective window.

The trial court properly viewed this factual scenario as inconsistent in both detail and nature with the later allegations added to the SAC that in 2021, "a catastrophic covered rain and windstorm with catastrophic wind occurred which caused openings in the roof and wall surfaces through which rain

17

intruded into the PREMISES, which were additional covered losses under the policy," and that appellants noticed an increase in the mold and mildew, "which Plaintiffs are informed and believe were a result of the water intrusion from wind driven rain in early 2021, including March 2021, which caused openings in the roof and wall surfaces through which rainwater intruded, and sudden and accidental discharges of water from the plumbing, all covered by the policy."

Rather than an increase in mold and mildew problems resulting from "ongoing water intrusion" in a building beset by structural defects, rampant disrepair, and poor maintenance, the SAC suddenly attributed the increase in mold and mildew problems at least in part to a sudden event—nonspecific openings in the roof and walls due to a windstorm, and storm-related sudden discharges of water from the plumbing. The inconsistency arose not only because the first two versions of the complaint appeared to describe mold and mildew—the basis of the insurance claim—as a result of ongoing structural and maintenance problems with the building, but, critically, because the earlier versions only generally referenced a lack of watertightness, and wind and rain as the source of the water damage and mold, omitting entirely what would be remarkable problems for any tenant: openings in the roof and walls through which rain is entering, or sudden discharges of water from a plumbing system.

In response to the Exchange's demurrer to the SAC, appellants offered no explanation for the delayed inclusion of the new allegations regarding damage caused by water entering through wind-caused openings in the roof and walls, or discharges of water from the plumbing. Instead, appellants

asserted the new allegations did not contradict the FAC's allegations; the sham pleading doctrine did not apply because the trial court never found there was a fatal material defect in the FAC that the SAC was falsely attempting to deny; and appellants could properly add more detail to their complaint.

These arguments did not explain why appellants had not included these allegations in either the original complaint or the FAC. They did not, for example, indicate that the facts were newly discovered. (Cf. *Deveny v. Entropin, Inc.* (2006) 139 Cal.App.4th 408, 426 [sham pleading doctrine not applicable where the amended complaint plausibly alleged new information was uncovered through "further discovery and consultation with experts"].) Nor did they indicate there had been a misunderstanding or mistake regarding the underlying facts. (Cf. *Dones*, *supra*, 55 Cal.App.5th at pp. 671, 688 [sham pleading doctrine rejected where change in the allegations did not alter the fundamental facts upon which breach of contract claim was based and pleading plausibly explained that a prior allegation was determined to be mistaken after further review of documents].)

The appellants' abrupt addition of these allegations espousing a different explanation for the cause of the mold and mildew is similar to the circumstances in *Owens v. Kings Supermarket* (1988) 198 Cal.App.3d 379 (*Owens*). There, the plaintiff alleged in his first two complaints that he was injured on a public roadway adjacent to the sidewalk in front of the defendant's store. The store twice demurred, asserting it had no duty to a plaintiff for the conduct of a third party in a public street or based on a hazardous condition in an adjacent public street. (*Id*. at pp. 382–383.) In opposition to the defendant's first two demurrers, the plaintiff never argued he was not injured in

the street.  (*Ibid*.)  He subsequently filed a SAC that was "identical in nearly all respects . . . except that it included an allegation that plaintiff was on defendants' premises when he was injured."  (*Id*. at p. 383.)  The trial court again sustained a demurrer, and the Court of Appeal affirmed, holding that the trial court was entitled to "disregard the inconsistent allegations."  (*Id*. at p. 384.)

The *Owens* court reasoned, "Only when it became apparent to plaintiff that the court would not accept his argument that the alleged 'special use' of the public street by the supermarket imposed a duty, did plaintiff allege, for the first time, that the injury occurred on 'defendant's premises' rather than in the street.  Plaintiff offered no explanation for this inconsistency to the court below or on appeal.  The conclusion is inescapable that this amendment was made solely for the purposes of avoiding a demurrer.  Thus, the court properly disregarded the allegation that the accident occurred on defendants' premises."  (*Owens*, *supra*, 198 Cal.App.3d at p. 384.)

Similarly, here, "[w]here no explanation for an inconsistency is offered, the trial court is entitled to conclude that the pleading party's cause of action is a sham and sustain a demurrer without leave to amend."  (*Zakk v. Diesel* (2019) 33 Cal.App.5th 431, 447; see also *Smyth v. Berman* (2019) 31 Cal.App.5th 183, 195 [without a plausible explanation the court will disregard the new and contrary allegations].)  Because appellants offered no explanation for the belated addition of a new, inconsistent theory of the cause of their losses, the trial court was entitled to disregard the new allegations.  Appellants do not contend that without those allegations the SAC sufficiently stated a cause of action for breach of contract.  (*Delta*

20

*Stewardship Council Cases* (2020) 48 Cal.App.5th 1014, 1075 ["It is not our place to construct theories or arguments to undermine the judgment and defeat the presumption of correctness."].)

## III. The Trial Court Correctly Sustained the Demurrer to the Breach of the Covenant of Good Faith and Fair Dealing Cause of Action in the SAC

Appellants next assert that the trial court erred in sustaining the demurrer to their breach of the covenant of good faith and fair dealing cause of action in the SAC.  We disagree.

"[A] plaintiff that cannot state a cause of action for breach of contract cannot assert a claim for breach of the implied covenant of good faith and fair dealing."  (*United Talent Agency v. Vigilant Ins. Co.* (2022) 77 Cal.App.5th 821, 841; *1231 Euclid Homeowners Assn. v. State Farm Fire & Casualty Co.* (2006) 135 Cal.App.4th 1008, 1021.)  "If the insurer's investigation— adequate or not—results in a *correct* conclusion of no coverage, no tort liability arises for breach of the implied [covenant]." (*Benavides v. State Farm General Ins. Co.* (2006) 136 Cal.App.4th 1241, 1250.)  As our high court has explained, "[W]hen benefits are due an insured, 'delayed payment based on inadequate or tardy investigations, oppressive conduct by claims adjusters seeking to reduce the amounts legitimately payable and numerous other tactics may breach the implied covenant because' they frustrate the insured's right to receive the benefits of the contract in 'prompt compensation for losses.'  [Citation.]  Absent that contractual right, however, the implied covenant has nothing upon which to act as a supplement, and 'should not be endowed with an existence independent of its contractual underpinnings.'  [Citation.]"  (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 36.)

21

Accordingly, because the SAC failed to state a claim that benefits were due under the Policy, the trial court did not err in sustaining the demurrer to the claim for breach of the implied covenant of good faith and fair dealing.

## IV. The Trial Court Correctly Sustained the Demurrer to the Intentional Infliction of Emotional Distress Cause of Action in the FAC

The elements of a cause of action for intentional infliction of emotional distress are "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff has suffered severe or extreme emotional distress; and (3) the defendant's outrageous conduct was the actual and proximate causation of the emotional distress." (*Jackson v. Mayweather* (2017) 10 Cal.App.5th 1240, 1265.) "A defendant's conduct is 'outrageous' when it is so ' " 'extreme as to exceed all bounds of that usually tolerated in a civilized community.' " ' [Citation.] And the defendant's conduct must be ' " 'intended to inflict injury or engaged in with the realization that injury will result.' " ' [Citation.]" (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1050–1051.) " 'Liability for intentional infliction of emotional distress " 'does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.' [Citation.]" [Citations.] . . .' " (*Bock v. Hansen* (2014) 225 Cal.App.4th 215, 233.)

None of appellants' allegations describe extreme and outrageous conduct. The FAC alleged that the Exchange failed to explain benefits, lied, and refused to investigate while knowing there was mold in the apartment. The FAC further alleged that the Exchange knew the premises were "uninhabitable," thus appellants were "essentially homeless" and were forced to live in

22

motels with their children during the COVID-19 pandemic. The FAC also asserted that in denying the claim, the Exchange "lied," "sought some sort of information from the [owners] which too was false," and the denial letter was "so vague" that appellants had no idea why the claim was denied and the letter contained a "hidden contractual time limit that was not explained."

These allegations do not state an intentional infliction of emotional distress claim. "California courts have held that delay or denial of insurance claims is not sufficiently outrageous to state a cause of action for intentional infliction of emotional distress." (*Coleman v. Republic Indemnity Ins. Co.* (2005) 132 Cal.App.4th 403, 417; *Mintz v. Blue Cross of California* (2009) 172 Cal.App.4th 1594, 1608.) Alleged lies and the failure to investigate are also insufficient. (*Ricard v. Pacific Indemnity Co.* (1982) 132 Cal.App.3d 886, 889, 890, 895 [insurer's intentionally false representations about claim processing, accusation against claimant, and failure to investigate and communicate not sufficiently outrageous for intentional infliction of emotional distress claim].) Conduct has also been held insufficiently outrageous where, as here, the insurer is alleged to have failed to advise the insured of a right. (*Mintz*, at p. 1609 [failure to advise of right to seek independent review of the denial did not support intentional infliction of emotional distress claim].) Even where the insurer allegedly misled the plaintiffs regarding the statute of limitations and advised them not to obtain an attorney, in violation of statutory duties, a court found the allegations insufficiently outrageous to state an intentional infliction of emotional distress cause of action. (*Coleman*, at p. 417.) Likewise, here, appellants' allegations of delay, denial, lies, misinformation, failure to explain benefits, or lack of an

23

investigation, do not allege outrageous conduct sufficient to state an intentional infliction of emotional distress cause of action.

## V. The Trial Court Properly Sustained the Demurrer to the Fraud Cause of Action in the FAC

The common law elements of fraud are: " '(1) misrepresentation of a material fact (consisting of false representation, concealment or nondisclosure); (2) knowledge of falsity (scienter); (3) intent to deceive and induce reliance; (4) justifiable reliance on the misrepresentation; and (5) resulting damage. . . . .' " (*Bower v. AT&T Mobility, LLC* (2011) 196 Cal.App.4th 1545, 1557.) A plaintiff must plead fraud with particularity and allege facts that " ' " 'show how, when, where, to whom, and by what means the representations were tendered.' " ' [Citation.]" (*Robinson Helicopter Co., Inc. v. Dana Corp.* (2004) 34 Cal.4th 979, 993.) "[I]n the case of a corporate defendant, the plaintiff must allege the names of the persons who made the representations, their authority to speak on behalf of the corporation, to whom they spoke, what they said or wrote, and when the representation was made." (*West v. JPMorgan Chase Bank, N.A.* (2013) 214 Cal.App.4th 780, 793 (*West*).) Fraud may not be pled only with general or conclusory allegations. (*Ibid.*)

Appellants assert the trial court erred in finding their allegations conclusory. On appeal, they point to allegations in the FAC that (1) the Exchange represented it would pay all covered losses and damages due under the renter's policy and do so promptly; (2) that the evaluation and appraisal of losses and damage would be based on skill and experience; (3) that the Exchange required undisclosed information to adjust the claim from the owners that it was unable to obtain; and (4) that its

24

denial letter was "vague" and had a "hidden contractual time limit" that was not explained to appellants. The FAC further alleged that the Exchange knew these representations were false and made the representations for economic gain.

These general and conclusory allegations are inadequate to state a cause of action for fraud. The FAC offered no specific details to indicate the representations identified were actually false. The conclusory statement that the Exchange knew its statements were false is insufficient. (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 645 ["general and conclusory allegations do not suffice"].) Moreover, "[i]t is insufficient to show an unkept but honest promise, or mere subsequent failure of performance." (*Riverisland Cold Storage, Inc. v. Fresno-Madera Production Credit Assn.* (2013) 55 Cal.4th 1169, 1183.)

The FAC also failed to allege how, when, where, to whom, and by what means the representations were tendered, aside from generally attributing them to the Exchange, and identifying one statement in the July 2021 denial letter. (*West*, *supra*, 214 Cal.App.4th at p. 793.) Appellants assert in their reply brief that they should not be required to allege fraud with specificity because the respondents had greater knowledge of the details of the statements. However, the allegations are based on communications from the Exchange to the appellants. There is no reason appellants could not allege with specificity the details of allegedly false communications made to them. (Cf. *Tarmann v. State Farm Mut. Auto. Ins. Co.* (1991) 2 Cal.App.4th 153, 158 ["State Farm has no more reason to know who made the allegedly false representations to Tarmann than Tarmann"].)

The trial court did not err in sustaining the demurrer to the fraud cause of action in the FAC.

25

## VI. The Trial Court Correctly Sustained the Demurrer to the Business and Professions Code Section 17200 Cause of Action in the FAC

Finally, appellants assert that the FAC adequately alleged a claim for violation of the Unfair Competition Law (UCL), Business and Professions Code section 17200. We disagree.

The UCL prohibits "any unlawful, unfair or fraudulent business act or practice . . . ." (Bus. & Prof. Code, § 17200.) "An unlawful business practice under section 17200 is ' "an act or practice, committed pursuant to business activity, that is at the same time *forbidden by law*. [Citation.]" ' [Citation.]" (*Progressive West Ins. Co. v. Superior Court* (2005) 135 Cal.App.4th 263, 287.) Thus, "[b]y proscribing 'any unlawful' business practice, 'section 17200 "borrows" violations of other laws and treats them as unlawful practices' that the [UCL] makes independently actionable." (*Cel–Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180; *Zhang v. Superior Court* (2013) 57 Cal.4th 364, 370.)

When a UCL claim is derivative of the other alleged causes of action, the "UCL claims rise or fall" with the other claims. (*Discovery Radiology Physicians*, *supra*, 94 Cal.App.5th at p. 548.) Appellants conceded the derivative nature of their UCL claim in the trial court, which they stated in their opposition to the demurrer was based on their breach of contract, breach of the implied covenant of good faith and fair dealing, and fraud claims. They also appear to concede this on appeal; they do not assert any alternative basis for this claim other than the causes of action against the Exchange in the FAC and SAC. The UCL claim therefore falls with those causes of action, and the trial court properly sustained the demurrer.

## VII. Appellants Fail to Establish that the Trial Court Abused Its Discretion in Sustaining the Demurrers to the FAC and SAC Without Leave to Amend

"When a demurrer is sustained without leave to amend, 'we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm.' [Citation.] Plaintiff has the burden to show a reasonable possibility the complaint can be amended to state a cause of action." (*Hamilton v. Greenwich Investors XXVI, LLC* (2011) 195 Cal.App.4th 1602, 1609; accord, *State Dept. of State Hospitals v. Superior Court* (2022) 84 Cal.App.5th 1069, 1076.)

To satisfy the burden of proving there is a reasonable possibility of amendment, "a plaintiff 'must show in what manner he can amend his complaint and how that amendment will change the legal effect of his pleading.' [Citation.] The assertion of an abstract right to amend does not satisfy this burden. [Citation.] The plaintiff must clearly and specifically set forth the 'applicable substantive law' [citation] and the legal basis for amendment, i.e., the elements of the cause of action and authority for it. Further, the plaintiff must set forth factual allegations that sufficiently state all required elements of that cause of action." (*Rakestraw v. California Physicians' Service* (2000) 81 Cal.App.4th 39, 43 (*Rakestraw*).)

Appellants have not met this burden. Although they argue the trial court erred by denying them leave to amend, they have not set forth how they would amend their complaint in a manner that would change the legal effect of the pleading. (*Rakestraw,*

*supra*, 81 Cal.App.4th at p. 43.)  Appellants have not established the trial court abused its discretion.

## DISPOSITION

The judgment is affirmed.  Respondents shall recover their costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


ADAMS, J.


We concur:



EDMON, P. J.



HANASONO, J.*

---

\*  Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.